Affirmed and Memorandum Opinion filed September 24,
2009.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO.  14-08-00126-CR

____________

 

BRIEN ROBERTS, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 338th
District Court

Harris County, Texas

Trial Court Cause No.  1078046

 



 

M E M O R A N D U M   O P I N I O N

Brien Roberts, the appellant, was
convicted of injury to a child and sentenced to twenty years= confinement in
the Institutional Division of the Texas Department of Criminal Justice. 
Roberts appeals his conviction contending that (1) the evidence at trial is
factually insufficient to support his conviction, (2) Roberts was egregiously
harmed by the omission of an instruction from the punishment phase jury charge,
and (3) he received ineffective assistance of counsel during both the guilt and
the punishment phases of his trial.  We affirm.








I

This case involves multiple serious
injuries to a two-year-old girl which ultimately caused her death.  On July 25,
2006, Forresa Kindley agreed to let her two daughters, A. and the complainant,
spend the night at the home of Kindley=s life-long friend
Desirae Tuffley.  Kindley and Tuffley were very close, and Kindley=s daughters
considered Tuffley an Aauntie.@  In fact, the
girls had spent the night at Tuffley=s home on many
prior occasions.  Tuffley shared her apartment with Roberts, who was her fiancé
at the time.  During the early evening on the following day, the complainant
became unconscious and unresponsive while at the home of Tuffley and Roberts. 
The complainant was taken by ambulance, first to Houston Northwest Medical
Center, and later to Texas Children=s Hospital.  The
complainant was pronounced brain dead on the morning of July 27.  

An autopsy revealed that the complainant
had died as a result of a massive head trauma that caused a fractured skull,
hemorrhaging, and brain swelling.  Roberts was charged with injury to a child. 
A jury found Roberts guilty.  The range of punishment was confinement for five
to ninety-nine years or life, with the option to recommend community
supervision if the punishment assessed was ten years or less.  The State asked
the jury to assess punishment at life imprisonment, and defense counsel argued
for five to ten years with a recommendation of community supervision. The jury
assessed punishment at twenty years= confinement.   

II








Roberts appeals his conviction on four
grounds: (1) the evidence is factually insufficient to prove that Roberts
caused bodily injury to the complainant; (2) Roberts was egregiously harmed by
the omission from the punishment phase jury charge of an instruction concerning
the State=s burden of proof on evidence of extraneous offenses
and bad acts; (3) Roberts received ineffective assistance of counsel during the
guilt phase of the trial when his trial counsel failed to request limiting
instructions concerning extraneous offenses; and (4) Roberts received
ineffective assistance of counsel during the punishment phase of the trial when
his trial counsel failed to request limiting instructions concerning extraneous
offenses.

A

In his first issue, Roberts contends that
the evidence produced at trial is factually insufficient to prove that he
caused bodily injury to the complainant.  Specifically, Roberts contends that
he was alone with the complainant for only a few minutes on the day in
question, under circumstances that would have made it impossible for him to
inflict the complainant=s injuries.  Further, Roberts asserts that
the complainant had exhibited no injuries before he left for work that morning,
leaving Tuffley alone with the complainant for more than five hours.  Finally,
Roberts argues that evidence of other peculiar circumstances make it more
likely that Tuffley inflicted the fatal injuries on the complainant.  

The State responds that the medical
evidence demonstrates the complainant died as a result of massive blunt force
head injuries, and that Roberts was alone with the complainant moments before
she lost consciousness.  Further, the medical evidence shows that the
complainant=s injuries could not have been caused by a simple
accident, or rough play with another.  Finally, the State argues that Roberts
lacked credibility as a witness based on the inconsistencies between his
statements to police and his trial testimony.  Consequently, the State contends
that the evidence is factually sufficient to support Roberts=s conviction.








On direct appeal, a court must begin its
factual-sufficiency review with the assumption that the evidence is legally
sufficient under Jackson v. Virginia, 443 U.S. 307 (1979).  Laster v.
State, 275 S.W.3d 512, 518 (Tex. Crim. App. 2009).  We view all the
evidence neutrally.  Watson v. State, 204 S.W.3d 404, 415 (Tex. Crim.
App. 2006); Newby v. State, 252 S.W.3d 431, 435 (Tex. App.CHouston [14th
Dist.] 2008, pet ref=d).  In conducting the analysis, we
discuss the evidence which the appellant claims is most important in allegedly
undermining the jury=s verdict.  Sims v. State, 99
S.W.3d 600, 603 (Tex. Crim. App. 2003); Newby, 252 S.W.3d at 435. 
Although we may disagree with the jury=s conclusion, we
must avoid substituting our judgment for that of the jury.  Drichas v. State,
175 S.W.3d 795, 799 (Tex. Crim. App. 2005); Newby, 252 S.W.3d at 435. 
It is not enough for this court to harbor a subjective level of reasonable
doubt to overturn a conviction that is founded on legally sufficient evidence. Watson,
204 S.W.3d at 417.  We cannot conclude that a conviction is Aclearly wrong@ or Amanifestly unjust@ simply because,
on the quantum of evidence admitted, we would have voted to acquit had we been
on the jury.  Id.  Nor can we declare that a conflict in the evidence
justifies a new trial simply because we disagree with the jury=s resolution of
that conflict.  Id.  We must first be able to say, with some objective
basis in the record, that the great weight and preponderance of the evidence
contradicts the jury=s verdict before we are justified in
exercising our appellate fact jurisdiction to order a new trial.  Id.








We begin our review by considering the
medical evidence presented at trial.  The State presented the testimony of
three doctors concerning the nature of the complainant=s injuries.  Dr. 
Morna Gonsoulin, an assistant medical examiner with Harris County, testified
that she performed an autopsy on the complainant=s body.  Dr.
Gonsoulin stated that this autopsy revealed that, while the complainant had
received blows to at least five different areas of her body, her death was
caused by subdural (between the scalp and the skull) and subarachnoid (inside
the skull) hemorrhaging brought about by a blunt force head injury.  The State
also presented testimony from Dr. Renan Ornellena, a pediatric trauma
specialist at Texas Children=s Hospital, who examined and treated the
complainant.  Both Dr. Gonsoulin and Dr. Ornellena described how a powerful
blow to the complainant=s head fractured her skull, causing the
hemorrhaging and also swelling of her brain.[1] 
Dr. Libby George, an emergency room specialist at Houston Northwest Medical
Center, who also examined and treated the complainant, testified that radiology
tests performed at her hospital revealed Asevere@ bleeding on the
brain caused by a forceful blow to the head.  Both Dr. Ornellena and Dr. 
George described the complainant=s head injury as
similar to those seen with children who were involved in high-speed car
accidents, or who have fallen from several stories.  

All three doctors testified that such a
significant blow to the headCforceful enough the fracture the
complainant=s skullC likely would
cause immediate unconsciousness.  In the rare event that the complainant was
not rendered immediately unconscious, she would not have been able to act Anormally.@  Dr. Ornellena
testified that such a victim, if still conscious, would not look sleepy, but
rather would Alook like [she is] dying,@ with symptoms
such as labored breathing.  Dr. Ornellena stated that such a victim could not
walk around.  On cross-examination, Dr. George stated that the possibility of
the complainant remaining conscious after such a blow to the head was Aa hard question.@  Dr. George
stated that it was possible that the complainant could have regained
consciousness briefly, but would have gone Adown hill@ rapidly after
that.  Further, Dr. George testified that, while she could not be Aone-hundred
percent certain@ that the victim of such a blow would be
unable to walk, it was Ahighly unlikely.@

In light of this uncontroverted testimony,
we consider the evidence concerning the events immediately prior to the
complainant=s loss of consciousness on the evening of June 25. 
There was testimony from three witnesses concerning the events of that period:
Roberts, Tuffley, and Rochelle Cook.  Each witness told generally the same
story about the events of that evening; however, significant differences
existed in each person=s account of critical details of the
incident.








Both Roberts and Tuffley agreed that when
Roberts came home from work around 5:20 p.m., Tuffley and the girls were in the
bedroom watching television.  Roberts went into the kitchen to cook some
noodles for himself and the girls.  Roberts testified that, because he came
home to find Tuffley and the girls in exactly the position they were in when he
had left for work, he was concerned that they had not moved or eaten since
11:00 am.  Tuffley said she told him that she had tried to feed the
complainant, but that she had not eaten more than a few mouthfuls.  

It is here that Roberts=s and Tuffley=s accounts begin
to diverge.  According to Tuffley, Roberts made some noodles for both himself
and the complainant.  But when the complainant refused to eat her noodles,
Roberts became angry with her.  Tuffley claimed that she heard the complainant
crying and that she came to her defense, causing Roberts to become angry at
Tuffley=s interference. 
Tuffley testified that the complainant was not emotionally close to Roberts and
did not like being around him.  Tuffley also stated that Roberts resented the
fact that the complainant was more comfortable with Tuffley than with him. 
Roberts testified that he was very close to the complainant, that they
frequently played and danced together, and that the disagreement over the
noodles was minor.

According to both Roberts and Tuffley,
Roberts then went for a walk outside the apartment taking the complainant with
him to get some fresh air.  Roberts testified that he carried the complainant
the whole time.  As they stepped outside the apartment, Roberts said he saw the
complainant=s grandmother drive up to another apartment across the
parking lot.  He pointed this out to the complainant, asking her if she saw her
grandmother.  Roberts testified that she nodded her head in response to him. 
But the grandmother did not see them, and drove away before they could talk to
her.  








Roberts said that he then took the
complainant over to where some of his friends were standing.  Roberts stated
that he talked with his friends for a few minutes, and that the complainant
played and interacted with his friends.  Roberts testified that while the
complainant had been drifting in and out of sleep earlier, she seemed to be
awakening now that they were outside the apartment walking about.  Tuffley
testified that Roberts and the complainant were outside the apartment for about
ten minutes. 

Roberts stated that he returned to the
apartment and laid the complainant down on the bed next to Tuffley and A.  Both
Roberts and Tuffley testified that they ordered a pizza, and then talked inside
the apartment for a little while.  Tuffley then took the girls outside to pay
for the pizza when she thought she saw the delivery driver arrive.  Seeing that
the driver went to another apartment, Tuffley took the girls  to Cook=s apartment,
located across the parking lot and in the same complex.

Cook was a close friend of Tuffley and
Roberts=s cousin.  Cook
testified that she and Roberts grew up together Alike brother and
sister.@  On direct
examination, Cook testified that Tuffley brought the girls over to her apartment
after 5:00 p.m., asking for treats for the girls.  Cook stated that the
complainant looked like she was sleeping as Tuffley carried her.  Tuffley said
she and the girls were at Cook=s apartment for about a half hour before
they all returned to Tuffley=s apartment.








All three witnesses agreed that as Tuffley
and Cook walked across the parking lot, they met Roberts returning from his
car.  They all ascended the stairway to Tuffley=s and Roberts=s apartment, but
did not go inside immediately.  The group stood or sat outside on the stairway
and porch area talking amongst themselves.  All three witnesses agreed that
Roberts then went inside, presumably to use the bathroom.  According to both
Roberts and Cook, Roberts returned a few minutes later saying that the toilet
was not working.  He asked Cook if she had a plunger, and Cook replied that she
did.  Then, according to both Roberts and Cook, the two women went back to Cook=s apartment to
retrieve the plunger,[2]
with Tuffley carrying the complainant.  Roberts and A. remained outside Roberts=s apartment. 
Cook, Tuffley, and the complainant  returned a few minutes later, delivering
the plunger to Roberts.  At this point, the witnesses= accounts begin to
differ more significantly.

1  

According to Tuffley, Cook remained at the
foot of the stairs, and Tuffley sat down on the first step from the top with
her back to the wall so that she could see inside the apartment.[3] 
Tuffley testified that A. and the complainant had gone inside the apartment.
She further testified that Roberts then walked inside the apartment, presumably
to use the bathroom, and was gone for about three minutes.  Roberts emerged
from the apartment and announced, AIt=s fixed,@ which Tuffley
inferred to mean the toilet.  Tuffley stated that A. and the complainant then
came back to the door and asked for some ice.  According to Tuffley, Roberts
then went back into the apartment to get ice for the girls.  Tuffley testified
that she could see into the apartment, but not into the kitchen.  A minute or
so later, Tuffley could see A. eating some ice.  But neither of the girls came
back to the front door.  Tuffley stated that she assumed they had gone into the
bedroom.  Tuffley further testified that while Roberts remained in the
apartment, she could not see whether he was in the kitchen or the bathroom. 
When Roberts=s defense counsel cross examined her, Tuffley again
stated that, while she could see into the apartment, she could not see into
either the kitchen or the bathroom.  








Less than ten minutes later, according to
Tuffley, Roberts emerged from the apartment  and said, A[Complainant] said
she was tired and so I=m going to put her to sleep.@  Tuffley then saw
Roberts lay the complainant on the couch and wrap her in a blanket.  At this
time, Tuffley said the complainant=s eyes were closed
and she was not moving.  Then A. came outside and Tuffley asked her to check on
the complainant.  A. went inside, returned, and said that the complainant was
still asleep.  At that point, Tuffley stated that she went indoors to awaken
the child, concerned that she had already slept too much throughout the day. 
Tuffley found the complainant unconscious and unresponsiveCa state from which
she never recovered.

2

According to Cook, after she, Tuffley, and
the complainant returned with the plunger, she handed the plunger to Roberts. 
Cook stated that she did not go inside the apartment, but rather stood in the
doorway.  Tuffley, on the other hand, went inside the apartment and stood near
the sofa.  Cook testified that Roberts then took the plunger and went into the
bathroom, presumably to fix the toilet.  Cook stated that while Roberts was in
the bathroom, Tuffley put the complainant down on the floor, steadied her, and
that the complainant then walked toward the back of the apartment where the
bedroom and bathroom were located.  According to Cook, immediately after the
complainant walked around the corner and out of Cook=s sight, Roberts
walked back out with her in his arms.  Cook testified that Roberts asked her, AMama are you
alright?@  Cook said that
the complainant was not crying but looked very drowsy and Aout of it.@  Cook further
testified that, in response to Roberts, the complainant said, AUncle Brien, I=m tired.@  According to
Cook, the complainant said this three or four times.  Roberts then carried the
complainant over to the sofa and laid her down.  Cook stated that Tuffley then
walked over to the complainant and found her to be asleep.  Cook stated that,
at the time, she was thinking a child Ashouldn=t fall asleep that
quick.@  The complainant,
however, was actually unconscious and unresponsive.  Cook testified that about
thirty minutes elapsed from when she handed the plunger to Roberts until the
complainant was discovered to be unconscious.

 








3

Roberts=s testimony
closely matched that of Cook.  But Roberts did not state that either Tuffley or
Cook had entered the apartment.  Instead, he recalled them both standing just
outside the door.  According to Roberts, he took the plunger into the bathroom
to work on the toilet.  Roberts stated that he could hear the girls= voices behind
him, and that he could hear A.=s voice over everyone else=s.  He further
stated that he wasn=t worried about the girls because he knew
that A[Cook] was at the
door watching them.@  When the State cross examined him,
Roberts testified that both Tuffley and Cook were outside the apartment, and
that he heard Tuffley tell the girls to go Ainside@ the apartment. 
Roberts indicated that Tuffley was standing outside the door on the patio,
while Cook was standing  below her on the stairs.  








Roberts testified that, while he was
working on the toilet, he heard a sound like a Asmall thump@Clike someone
falling hard onto carpeting.  Suspecting that the girls were playing roughly,
he poked his head out of the bathroom door and saw the complainant Alaying on the
floor, kind of slumped over.@  Assuming that she had hurt herself while
playing with A., Roberts testified that he picked her up and asked her if she
was okay.  He asked her if she wanted to lie down in bed, and according to
Roberts, she nodded her head.  Roberts stated that he then took her into the
bedroom of the apartment and laid her down on the bed.  Roberts then returned
to the bathroom, turned off the lights, and Aput up everything.@  Roberts said he
then looked in on the complainant, and that her eyes were closed as if she were
sleeping.  Not wanting to leave the child alone, Roberts testified that he then
carried her into the living room and laid her on the sofa.  He then walked
outside and tried to listen to Cook and Tuffley=s conversation, but
was troubled by the fact that the complainant was asleep.  Roberts testified
that he felt the complainant had been unnaturally sleepy since he had come home
from work, in a way that was unlike her usual behavior.  Roberts testified that
he stood listening to Cook and Tuffley for ten to fifteen minutes, and then
asked A. to go inside and check on the complainant.  A. went inside and
returned to report that the complainant was sleeping. 

According to Roberts=s testimony, he
continued to stand outside the apartment listening to Tuffley and Cook=s conversation. 
Roberts stated that Tuffley then started to go inside the apartment, and
Roberts asked her to place pillows around the complainant to prevent her from
falling off of the sofa.  After Tuffley started to move the pillows, Roberts
testified that he told Tuffley to just Abring her over
here where we are,@ meaning closer to the door of the
apartment.  At that point, according to Roberts, Tuffley began speaking to the
complainant, took her hand, and immediately dropped itCapparently as she
discovered that the complainant was unresponsive.  Roberts testified that he
then ran into the apartment and tried to wake up the complainant.

From this point forward the three
witnesses generally agreed upon their efforts to revive the complainant. 
Roberts called his mother to ask for her advice on how to awaken the child. 
Tuffley called 9-1-1, her mother, and then the complainant=s mother. 
Ultimately Cook took the complainant in her arms and carried her into the
bathroom and attempted to revive her with cold water and a towel.  Later,
Tuffley=s mother arrived,
followed quickly thereafter by an ambulance and Kindley.         








All three witnesses described the
complainant=s demeanor as Asleepy@ or Adrowsy@ before her loss
of consciousness.  Tuffley testified that the complainant had been acting
sleepy all day.  Cook stated that when she saw the complainant early that
morning, and again just before noon, she appeared AOK@ and was watching
television and occasionally walking around the apartment.  On direct
examination, Cook testified that when she saw Tuffley with the complainant
again after 5:00 p.m., the complainant looked Alike she was
drowsy, like she was sleepy.@  Cook first testified that the
complainant did not look as if she had a cold, but then stated that she looked
like she had pneumonia.  When Roberts=s counsel cross
examined her, Cook described the complainant as being Adraped@ over Tuffley=s shoulder, Afalling in and out
of consciousness.@  Roberts described both little girls as
looking fine before he left for work around 11:30 a.m. that morning.  But upon
observing her after he got home, Roberts described the complainant as Anot [looking] like
her normal self.@  Roberts testified that the complainant
was not eating, playing, or displaying her usual amount of energy.  But all
three witnesses testified to seeing the complainant walking and talking to some
degree before being alone with Roberts inside the apartment.  Further, Tuffley
testified that the complainant did not go to sleep until around 1:00 a.m. the
night before, and that she woke up twice during the night.








Roberts points to several alleged
weaknesses in the State=s case for support of his contention that
this evidence is factually insufficient to support his conviction for injury to
a child.  First, he argues that there is no evidence that he had the
opportunity to inflict all of the injuries described by the assistant medical
examiner.  Dr. Gonsoulin testified that she discovered deep tissue bruising and
hemorrhaging in five different areas of the complainant=s body.  Roberts
contends that, because he was alone with the child for only a few minutes, he
could not have inflicted each of these injuries upon the child without being
observed by either Tuffley or Cook.  But this argument cannot succeed because,
while there is evidence of multiple injuries to the child, the offense for
which Roberts was charged related to serious bodily injury and to complainant=s head injury. 
Since both Dr. Ornellena and Dr. Gonsoulin testified that the complainant=s skull fracture
and additional resulting injuries were caused by one traumatic blow to her
head, all that the State was required to prove was the opportunity for Roberts
to strike one blow.  Further, Roberts=s assertion that
he lacked the opportunity to deliver the fatal blow is belied not only by
Tuffley=s testimony, but
also his own.  Tuffley stated that when Roberts re-entered the apartment to get
the girls ice, he was alone with them for Aless than ten
minutes@ before coming out
to tell Tuffley and Cook that the complainant was tired.  Even Roberts himself
described how he was in the bathroom alone working on the toilet, found the
complainant in a heap, took her to the bedroom, returned to the bathroom to
turn out the lights and clean up, and then went back to the bedroom to observe
her.  Roberts testified that he watched the complainant sleeping, thought about
her condition, and then carried her to the sofa.  Roberts gave no estimation
for the amount of time he was alone with the complainant, but his testimony is
consistent with the approximate time period described by Tuffley.  This period
of even a few minutes would have been sufficient for Roberts to strike the one
traumatic blow to the complainant=s headCthe subject of the
charged offense.

Next, Roberts contends that the evidence
establishes that the complainant was Aperfectly healthy@ before he left
her alone with Tuffley for five hours.  This assertion is made in an attempt to
shift blame for the complainant=s injuries to Tuffley, on the basis that
she had a greater opportunity to inflict the complainant=s injuries.  But
this argument ignores the most compelling facts of Dr. Ornellena=s and Dr.
Gonsoulin=s testimony.  Both doctors testified that the
traumatic blow to the complainant=s head almost
certainly would have rendered her unconscious immediatelyCor very soon thereafter. 
In any event, the complainant would have appeared to be in an unmistakably
desperate condition.  Because Roberts, Tuffley, and Cook all testified to
seeing the complainant walk and talk after Roberts came home from work, the
traumatic blow could not have been delivered while Tuffley was alone with the
complainant.








Further, Roberts points to several Asuspicious@ questions about
Tuffley=s involvement. 
Roberts asserts that when the complainant Ahad fallen into
unconsciousness and everyone, including Roberts, was frantically trying to
resuscitate her, Tuffley went downstairs to write a check for the pizza
deliveryman.@  But under cross-examination, Roberts himself
admitted that he never actually saw Tuffley pay the delivery driver.  Cook
testified that Tuffley went outside to pay for the pizza after the complainant
had been removed to the ambulance.  But when pressed on this fact, she stated
that she was sitting on the sofa when Tuffley=s brother told her
that the delivery driver was outside.  Like Roberts, Cook did not testify to
having seen Tuffley pay for the pizza.  Tuffley testified that she and Roberts
encountered the driver as they were walking to their car to follow the
ambulance to the hospital.  Tuffley described this encounter as a rushed scene
in which they told the driver that there was an emergency and that they had to
go the hospital.  Roberts=s attempt on appeal to portray Tuffley as
detached during the crisis, and more interested in pizza, is at odds with the
trial testimony. 

Finally, Roberts points to the relevance
of a tattoo that Tuffley obtained after the complainant=s death.  Tuffley
testified that she bears a tattoo on her shoulder reading, AOnly God knows my
heart.  R.I.P. [complainant].@  Tuffley testified that this tattoo means
that AGod knew that I
had nothing to do with [complainant=s] death and the
separation between our families and God knows I would never do nothing like
that.@  By contrast,
Roberts asserts that this tattoo could articulate Tuffley=s guilt regarding
her personal culpability for the complainant=s injuries.  But
Tuffley testified repeatedly to her strong love and affection for the
complainant, as well as her sorrow over the complainant=s death.








Ultimately, the jury had to decide upon
the credibility of the three primary witnesses: Tuffley, Cook, and Roberts. 
None of the witnesses had a perfect memory regarding the events of that night,
or their prior descriptions of them.  Tuffley did not remember borrowing the
plunger from Cook, and testified that she thought she had repaired the toilet
herself earlier in the day.  Cook admitted to significant differences between her 
trial testimony and the statement she gave to sheriff=s deputies on the
night of the incident. In fact, the State pointed out at least nine separate
occasions where Cook in her trial testimony described specific details of the
incident that she never mentioned in her statement to investigators.  Further,
Cook=s description
about Roberts carrying the complainant out to the sofa was completely
inconsistent with Roberts=s versionCthat he picked her
up, carried her to the bedroom, and laid her down before returning to the
bathroom.  Cook described this event as immediate, while Roberts described a
process involving multiple actions separated by the time he took to examine the
complaint and consider her condition.  Moreover, Cook testified that she
watched Roberts carry the complainant from around the corner, despite Roberts=s testimony that
Cook was outside the apartment and several steps down from the porch.  Finally,
Cook testified that, just minutes before the complainant lost consciousness,
Cook heard the complainant say, AUncle Brien, I=m tired,@ three to four
times.  This fact would conflict with the testimony of Dr. Ornellena and Dr.
Gonsoulin concerning the complainant=s ability to speak
after her skull was fractured.  Tuffley did not mention the complainant talking
after she went inside the apartment with Roberts.  

Roberts=s credibility also
was challenged.  Roberts testified that he gave a voluntary statement to
investigators on the night of the incident in which he swore to disclose all
relevant information concerning the incident.  But several hours later, Roberts
again spoke with investigators, this time adding to his original statement and
detailing an earlier incident with the complainant on the night before when
Roberts thought the complainant might have hit her head on a television in the
dark.[4]  
Later, Roberts admitted that his trial testimony included even more details not
covered by either of his prior statements to investigators.  Further, Roberts
described walking outside the apartment and listening to the women talk for ten
to fifteen minutes before sending A. back inside to check on her sisterCan account wholly
different from both Tuffley=s and Cook=s descriptions.   

It is for the jury to determine if they
believe that these witnesses are lying or telling the truth.  See Lancon v.
State, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008).  Because the jury is the
sole judge of a witness=s credibility, and the weight to be given
the testimony, it may choose to believe some testimony and disbelieve other
testimony.  Id.  Due deference must be given to the fact finder=s determinations
concerning the weight and credibility of the evidence, and reversal of those
determinations is appropriate only to prevent the occurrence of a manifest
injustice.  Martinez v. State, 129 S.W.3d 101, 106 (Tex. Crim. App.
2004).








There was little evidence presented about
the specific means Roberts used in committing the offense.  But a neutral
review of the evidence reveals three important facts that determine our
decision. The first is the compelling and unrebutted medical testimony from
three doctors that the complainant suffered a powerful blow to the head that
almost certainly rendered her immediately unconscious.  Second, Roberts was the
only person alone with the complainant in the crucial thirty‑minute
period before she lost consciousness.  While the testimony about this period
varied, it was between a few minutes to something less than ten minutes.  Even
this brief period would have been enough for Roberts, a former high school
football player standing 5= 10@ and weighing 220
lbs., to inflict one traumatic blow.  Finally, both Tuffley and Roberts
testified that Tuffley and Cook were standing outside the apartment conversing
while Roberts was inside the apartment.  Consequently, they would not have been
able to see what Roberts was doing with the complainant in either the bathroom
or the bedroom.

Under the applicable standard of review,
we cannot say, with some objective basis in the record, that Roberts=s conviction is Aclearly wrong@ or Amanifestly unjust@ because the great
weight and preponderance of the evidence contradicts the jury=s verdict.  See
Watson, 204 S.W.3d at 414B17.  We conclude, therefore, that the
evidence is factually sufficient to support Roberts=s conviction.

We overrule Roberts=s first issue.

B








In Roberts=s second issue he
contends that in the punishment phase of his trial, he was egregiously harmed
by the omission from the jury charge of a beyond‑a‑reasonable‑doubt
instruction regarding extraneous offenses and bad‑act evidence.  Roberts
asserts that such an instruction was necessary because the State presented
evidence concerning injuries to the complainant apart from those specified in
the indictment.  Roberts contends that, as a result of the trial court=s failure to give
the burden‑of‑proof instruction, the jury was able to consider the
evidence of other bad acts committed by Roberts using a lesser standard
resulting in egregious harm from a  harsher sentence.  The State responds that
such an instruction was not required in this case; and that even if the court
did err in failing to give it, such error did not result in egregious harm.  

The review of alleged charge error is a
two‑step process.  Abdnor v. State, 871 S.W.2d 726, 731B32 (Tex. Crim.
App. 1994).  First, we examine the jury charge to see if the trial court
erred.  Abdnor, 871 S.W.2d at 731.  Second, if we find that the trial
court erred, we must determine if the harm is sufficient to warrant reversal.  Abdnor,
871 S.W.2d at 731B32.  The degree of harm necessary for
reversal depends on whether the error was preserved. Hutch v. State, 922
S.W.2d 166, 171 (Tex. Crim. App. 1996).  In the absence of a request or
objection, jury-charge error does not require reversal unless it causes Aegregious harm.@  Id. at
171B72. 








The State may offer punishment‑phase
evidence as to any matter the court deems relevant to sentencing, including
evidence of an extraneous crime or bad act that is shown beyond a reasonable
doubt to have been committed by the defendant.  Tex. Code  Crim. Proc. Ann.
art. 37.07 ' 3(a) (Vernon 2006 & Supp. 2008); Sims v. State,
273 S.W.3d 291, 295 (Tex. Crim. App. 2008).  When evidence of extraneous
offenses or bad acts is admitted during the punishment phase, the trial court
is usually required to instruct the jury sua sponte on the reasonable‑doubt
standard of proof.  Huizar v. State, 12 S.W.3d 479, 484 (Tex. Crim. App.
2000).  However, if the extraneous offenses constitute same-transaction
contextual evidence, then the trial court is not required to instruct the jury
sua sponte regarding the reasonable‑doubt standard of proof for
extraneous offenses and bad acts.  See Garza v. State, 2 S.W.3d 331, 335
(Tex. App.CSan Antonio 1999, pet. ref=d). 
Same-transaction contextual evidence imparts to the jury information essential
to understanding the context and circumstances of events which, although
legally separate offenses, are blended or interwoven.  See Camacho v. State,
864 S.W.2d 524, 532 (Tex. Crim. App. 1993). As such, it is admissible to
illuminate the nature of the crime alleged.  See id.

Dr. Gonsoulin testified regarding the
injuries to the complainant that she observed  during the autopsy of the
complainant=s body.  Dr. Gonsoulin discussed a diagram in her
autopsy report that showed the internal injuries she found during the autopsy. 
Dr. Gonsoulin described a fracture to the complainant=s skull, and hemorrhages
in the following parts of the complainant=s body: in the
muscles above the complainant=s ears; under the complainant=s scalp; and in
tissue in the area of the complainant=s buttocks, back,
and shoulders.  Dr. Gonsoulin testified that all these injuries would have been
sustained within the same twenty-four-hour period.  Dr. Gonsoulin described observing
nine different locations of injuries, indicating at least six blows to the
complainant=s bodyCone to the head, three to the buttocks,
one to the back, and one to the shoulders.  Dr. Gonsoulin testified that,
beyond the fractured skull, hemorrhaging, and bruising, she also discovered
evidence of liquefied fat.  This phenomenon occurs when an individual is struck
with such powerful force that the liquid within the body=s fat cells at the
point of impact is forced out of the cells and pools in the soft tissue.  Dr.
Gonsoulin stated that such evidence demonstrates a Asignificant blow,@ and is usually
seen in accidents where pedestrians are struck by cars.  Dr. Gonsoulin
testified that complainant=s injuries are consistent with complainant
having been struck with an adult man=s hand or with an
unknown object. 








Roberts asserts that the injuries to the
complainant=s buttocks, back, and shoulders would not constitute
the serious bodily injury alleged in the indictment.  For the sake of our
analysis we presume that this is so.  Nevertheless, the offense charged in the
indictment was intentionally or knowingly causing serious bodily injury to the
complainant.  There was evidence that there were times during the last
twenty-four hours of the complainant=s life during
which Roberts was the only adult with the complainant and thus had the
opportunity to cause injury to the complainant.  There was evidence that the
complainant woke up twice in the early morning hours of July 25, 2006, and that
Roberts was the only adult who went to check on her in the room in which she
was sleeping.  There was also evidence that Roberts was the only adult with the
complainant for a less-than-ten-minute period later, not long before Tuffley
noticed that the complainant was unconscious rather than sleeping.  On the
other hand, Tuffley was also the only adult with the complainant at times
during the last twenty-four hours of the complainant=s life, and one of
Roberts=s defensive
theories at trial was that Tuffley=s conduct or an
accident injured the complainant during one of these time periods.  The autopsy
report showed a variety of injuries to complainant, and Dr. Gonsoulin testified
that these injuries all occurred within the same twenty-four-hour period.  On
this record, we conclude that the  evidence of the non-lethal injuries to the
complainant, even if they were evidence of extraneous offenses, imparted to the
jury information essential to understanding the context and circumstances of
events which, although legally separate offenses, were blended or interwoven.  See
Camacho, 864 S.W.2d at 531B32; Garza, 2 S.W.3d at 334B35.  This evidence
was same-transaction contextual evidence, and the trial court was not required
to instruct the jury sua sponte regarding the reasonable‑doubt standard
of proof for extraneous offenses.  See Garza, 2 S.W.3d at 335.  The
trial court did not err in failing to give the reasonable-doubt instruction as
to this evidence during the punishment phase. See id.  Accordingly, we
overrule Roberts=s second issue.[5]

C

In Roberts=s third and fourth
issues he contends that he received ineffective assistance of counsel during
both the guilt and punishment phases of his trial when his trial counsel failed
to request limiting instructions concerning the alleged extraneous offenses discussed
in the second issue. 








Ineffective-assistance-of-counsel claims
are governed by the two‑pronged test announced in Strickland v.
Washington, 466 U.S. 668 (1984).  We apply the Strickland test when
reviewing allegations of ineffective assistance during non‑capital
punishment proceedings.  Gholson v. State, 5 S.W.3d 266, 272B73 (Tex. App.CHouston [14th
Dist.] 1999, pet. ref=d).  To prove ineffective assistance,
Roberts must demonstrate by a preponderance of the evidence that counsel=s representation
fell below the standard of prevailing professional norms and a reasonable
probability that the result of the proceeding would have been different but for
trial counsel=s deficient performance.  Strickland, 466 U.S.
at 687B96; Salinas v.
State, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005).  A Strickland claim
must be firmly founded in the record, and the record must affirmatively
demonstrate the meritorious nature of the claim.  Goodspeed v. State,
187 S.W.3d 390, 392 (Tex. Crim. App. 2005).  Direct appeal is usually an inadequate
vehicle for raising such a claim because the record is generally undeveloped.  Id. 
AThis is true with
regard to the question of deficient performanceCin which counsel=s conduct is
reviewed with great deference, without the distorting effects of hindsightCwhere counsel=s reasons for
failing to do something do not appear in the record.@  Id. 
Unless the record contains evidence regarding the trial counsel=s strategy, an
appellate court should not find deficient performance unless the challenged
conduct was so outrageous that no competent attorney would have engaged in it. 
Id.








Roberts contends that his trial counsel
acted deficiently by failing to request limiting instructions concerning the
alleged extraneous offenses discussed above under the second issue.  Because
the evidence regarding these alleged extraneous offenses was same-transaction
contextual evidence, the trial court was not required to give a limiting
instruction when the evidence was admitted or to give a jury instruction
regarding the reasonable‑doubt standard of proof for extraneous
offenses.  See Camacho, 864 S.W.2d at 535; Garza, 2 S.W.3d at 334B35.  On this basis
alone, trial counsel=s failure to request limiting instructions
was not ineffective assistance.  See Riles v. State, 595 S.W.2d
858, 861 (Tex. Crim. App. 1980) (indicating that the failure to make a
meritless objection does not render counsel ineffective). 

Further, the record in this case does not
contain evidence regarding the trial counsel=s strategy. 
Roberts argues to the contrary, claiming that his trial counsel=s strategy was
obviously to argue that the injuries to the complainant=s buttocks, back,
and shoulders were A>old= injuries, as
evidenced by the absence of obvious bruising.@  Roberts asserts
that his trial counsel wanted Ato draw attention to these extraneous
offenses, whoever committed them, while arguing at the same time that it was
not Roberts who was responsible.@  However, Roberts
infers this trial strategy based on statements by Roberts=s counsel during
closing argument.  These arguments do not speak to counsel=s trial strategy
in failing to request limiting instructions concerning the alleged extraneous
offenses discussed above.  The record is silent as to trial counsel=s trial strategy
in this regard, and Roberts has not shown that the challenged conduct was so
outrageous that no competent attorney would have engaged in it. Therefore,
Roberts has failed to rebut the presumption of effective representation.[6] 
See Perez v. State, 56 S.W.3d 727, 731B32 (Tex. App.CHouston [14th
Dist.] 2001, pet. ref=d).

 

 

 

 

 

 








Roberts=s third and fourth
issues are overruled.

For the foregoing
reasons, we affirm the trial court=s judgment.

 

 

 

 

 

/s/      Jeffrey V.  Brown

Justice

 

 

 

 

Panel consists of Justices Frost, Brown, and Boyce.

Do Not Publish C Tex. 
R.  App.  P.  47.2(b).









[1]  These doctors also testified that the complainant
had also suffered a fork‑shaped burn on her shoulder. There was
conflicting testimony concerning whether Roberts  inflicted this burn on the
complainant in an effort to revive her.  Roberts testified that when he called
his mother seeking help in his attempts to revive the child, his mother
recommended that he use the Ahot or cold@ method to stimulate the child into consciousness.
This would require placing something hot or cold against the child=s skin.  Roberts denied having touched the complainant
with a hot fork.  But both doctors testified that they saw a fork‑shaped
burn on her shoulder.  A photo of this burn was admitted into evidence and
published to the jury.  Further, a fork was discovered lying on the stove of
the apartment.  Roberts was the only person reported to have carried the complainant
into the kitchen during the revival attempts.





[2]  Tuffley did not remember going to Cook=s apartment for the plunger.  She testified as having
thought that she had repaired the toilet earlier herself.  She also testified
that she thought that she owned the plunger shown in the State=s exhibit photos. 





[3]  The demonstrative diagram and photographs of the
apartment=s interior and exterior, used extensively throughout
the trial, showed that the apartment actually ran behind the wall upon which
Tuffley claims to have rested.  Consequently, the only view that Tuffley could
have had inside the apartment would have been straight through the front door
to the rear patio.  A straight line of sight would not have included the
kitchen, bathroom, or bedroom areas as these areas would have been behind her.

. 





[4]  According to Drs. Ornellena and Gonsoulin, such an
injury would not be sufficiently powerful  to result in the head trauma that
caused the complainant=s death.





[5]  Even if the evidence in question were not same-transaction contextual
evidence, we would still conclude that the omission from the punishment-phase
jury charge of a beyond‑a‑reasonable‑doubt instruction
regarding extraneous offenses and bad‑act evidence did not cause Roberts
egregious harm.





[6]  Even if Roberts=s
trial counsel had performed deficiently by not requesting the limiting
instruction, we would conclude that Roberts has failed to demonstrate a
reasonable probability that, but for counsel=s
deficiency, the result of the proceeding would have been different.